Eric D. Goldberg (SBN 157544)
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel: 310.595.3000
Fax: 310.595.3300
Email:  eric.goldberg@us.dlapiper.com

Attorneys for Prometeon Tyre Group
Commercial Solutions, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>TIRES DIRECT, INC.,<br><br><div align="center">Debtor.</div> | Case No. 8:21-bk-10245-SC<br><br>Chapter 11<br>Subchapter V<br><br>**JOINT MOTION OF TIRE SUPPLIERS TO (1) DE-DESIGNATE CASE AS A SUBCHAPTER V CASE; AND (2) CONVERT CASE TO CHAPTER 7**<br><br>Date:  April 29, 2021<br>Time: 11:00 a.m.<br>Place: Via Zoom for Government |

Creditors Prometeon Tyre Group, LLC ("<u>Prometeon</u>") and  Magna Tyre Group ("<u>Magna</u>," and together with Prometeon, the "<u>Suppliers</u>") hereby move the Court for an order de-designating the Chapter 11 case of debtor-in-possession Tires Direct, Inc. ("<u>TDI</u>") as a Subchapter V case and converting it to a liquidation case under Chapter 7.  This Motion is based on the attached Memorandum of Points & Authorities; the accompanying Declarations of Eric Goldberg ("<u>Goldberg Decl.</u>") and Michael de Ruijter ("<u>de Ruijter Decl.</u>"); the record in this case; and the arguments of counsel who appear at the hearing on the Motion.

180175804.2

# TABLE OF CONTENTS

Page No.

I.      INTRODUCTION ................................................................................................ 5

II.     STATEMENT OF FACTS ................................................................................. 6

        A.      TDI's Liquidated Debts Exceed the SBRA's $7.5 Million Limit. ...................... 6

        B.      TDI Is Not "Engaged in Commercial or Business Activities". ........................... 8

        C.      Mr. Veen, TDI's President & CEO, and TTW's Authorized
                Representative, Is A Convicted Felon and Thus Not Qualified to Serve
                as A Fiduciary for Creditors. ............................................................................. 9

        D.      TDI Had Almost No Cash on Hand When It Filed Bankruptcy Because
                Mr. Veen Caused It All to Be Distributed to His Family And Affiliates............ 12

III.    ARGUMENT ..................................................................................................... 13

        A.      TDI Is Not Eligible to Be an SBRA Debtor Because Its Liabilities
                Exceed $7.5 Million And It Is Not "Engaged In Commercial Or
                Business Activities"........................................................................................... 13

        B.      Mr. Veen Is Not A Proper Fiduciary and Is Not Qualified to Serve as
                The CEO Or Authorized Representative of Any Debtor.................................. 15

        C.      TDI's Chapter 11 Case Should Be Converted to Chapter 7. ........................ 17

IV.     CONCLUSION ................................................................................................. 21

180175804.2

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*3685 San Fernando Lenders, LLC v. Cross Equities Partners, LLC (In re USA*

5

    *Commercia Mortg. Co.)*, 452 Fed,Appx. 715, 724 (9th Cir. 2011) .................................16

6

*In re Cloudeeva, Inc.*,

    2014 WL 6461415 (Bankr. D. N.J. Nov. 18, 2014) .........................................................14

7

*Commodity Futures Trading Com'n v. Weintraub*,

8

    471 U.S. 343 (1985) .........................................................................................................14

9

*In re Cord David Johnson*,

    Case No. 19-42063-ELM, 2021 WL 825156 (Bankr.N.D.Tex.. Mar. 1,

10

    2021) ................................................................................................................................14

11

*Foestvedt v. Down (In re Fostvedt)*,

12

    823 F.2d 305 (9th Cir. 1987) ...........................................................................................13

13

*Gomez v. U.S. Trustee*,

    2010 WL 582706 (W.D. Va. Feb. 18, 2010) ...................................................................15

14

*Hassen Imports Partnership v. City of West Covina (In re Hassen Imports*

15

    *Partnership)*,

    Case No. CC-13-1042, 2013 WL 4428508 (9th Cir. BAP Aug. 19, 2013).....................17

16

*In re Houston Regional Sports Network, L.P.*,

17

    505 B.R. 468 (Bankr. S.D. Tex. 2014) ...........................................................................14

18

*In re LG Motors, Inc.*,

19

    422 B.R. 110 (Bankr.N.D.Ill. 2009) .................................................................................17

20

*In re Miell*,

21

    419 B.R. 357 (Bankr. N.D. Iowa 2009) ...........................................................................15

22

*In re Nicholes*,

    184 B.R. 82 (9th Cir. BAP 1995).....................................................................................13

23

*Matter of Nugelt*,

24

    142 B.R. 661 (Bankr. D. Del. 1992) ...............................................................................14

25

*In re Parking Management, Inc.*,

26

    620 B.R. 544 (Bankr.D.Md. 2020) ..................................................................................12

27

*In re Sakon*,

    617 B.R. 7 (Bankr.D.Conn. 2020) ...................................................................................17

28

180175804.2

*In re Sann*,
  2015 Bankr. LEXIS 1462, 2015 WL 1943911 (Bankr. D. Mont. 2015) ........................... 15

*Slack v. Wilshire Ins. Co. (In re Slack)*,
  187 F.3d 1070 (9th Cir. 1999) ....................................................................................... 13

*In re Thurmon*,
  --- B.R. ----, 2020 WL 7279555 (Bankr.W.D.Mo. 2020) ............................................... 13

*In re V. Savino Oil & Heating Co., Inc.*,
  99 B.R. 518 (Bankr. E.D.N.Y. 1989) ............................................................................. 14

*In re Vascular Access Centers, L.P.*,
  611 B.R. 742 (Bankr. E.D. Pa. 2020) ............................................................................ 14

*In re Wenberg*,
  94 B.R. 631 (9th Cir. BAP 1988) ................................................................................... 13

**Statutes**

11 U.S.C. § 103(i) ................................................................................................................. 12

11 U.S.C. § 341 ...................................................................................................................... 6

11 U.S.C. § 1104(a) ........................................................................................................ 14, 15

11 U.S.C. § 1104(a)(1) .......................................................................................................... 15

11 U.S.C. § 1112(b) ........................................................................................................ 16, 18

11 U.S.C. § 1112(b)(1) .......................................................................................................... 17

11 U.S.C. § 1112(b)(4)(A) ............................................................................................... 16, 17

11 U.S.C. § 1182 ............................................................................................................. 12, 13

11 U.S.C. § 1182(1) .......................................................................................................... 5, 12

11 U.S.C. § 1182(1)(A) ................................................................................................. 5, 8, 13

18 U.S.C. § 1343 ................................................................................................................... 16

**Other Authorities**

7 *Collier on Bankruptcy* ¶ 1112.04[6][a][ii] (Alan J. Resnick and Henry J.
  Sommer eds., 16th ed.) .............................................................................................. 17

180175804.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MEMORANDUM OF POINTS & AUTHORITIES

## I.

## INTRODUCTION

TDI filed this case on February 1, 2021 ("Petition Date") as a "small business" case under the Small Business Reorganization Act ("SBRA") provisions of Chapter 11, even though it was ineligible to do so for two independent reasons. First, TDI ceased operations prior to the Petition Date, and thus was not "engaged in commercial or business activities" on the Petition Date, as required by Bankruptcy Code section 1182(1)(A) in order to be eligible to be a debtor under the SBRA. Second, as of the Petition Date TDI's aggregate noncontingent liquidated secured and unsecured debt exceeded by millions of dollars the SBRA's $7.5 million debt limit for small business debtors, as set forth in section 1182(1)(A) of the Bankruptcy Code.

Normally, a debtor's failure to meet the SBRA's eligibility rules would result in the debtor losing its SBRA designation and getting "kicked out" to "regular" Chapter 11. TDI, however, does not belong in 'regular' Chapter 11 either. TDI has no viable business, no ability to confirm a plan, and no honest fiduciary to manage its affairs for the benefit of the estate and its creditors. Indeed, *TDI is controlled by a convicted felon who served several years in prison for wire fraud in connection with a scheme to defraud creditors of a tire business just like the one he claims to intend to reorganize here.*

In sum, TDI cannot be a debtor in an SBRA case because it simply is not eligible. And TDI should not be in "regular" Chapter 11 either because its estate is diminishing in value and it has no reasonable prospect of being able to confirm a plan of reorganization. TDI's case should be de-designated as a Subchapter V case and should be converted to Chapter 7 so that a true fiduciary can be appointed to liquidate TDI's assets and investigate and pursue avoidance actions for the benefit of creditors.

180175804.2

**II.**

**STATEMENT OF FACTS**

**A. TDI's Liquidated Debts Exceed the SBRA's $7.5 Million Limit.**

When it filed its Chapter 11 petition ("Petition") [Dkt. No. 1], TDI claimed it was eligible to proceed as a small business debtor under the SBRA by checking the box on Question No. 8 of the Petition to indicate that "its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000". Petition, p.2, #8. Three weeks later, when it filed its Schedules of Assets & Liabilities ("Schedules") [Dkt. No. 16], such Schedules listed total liabilities of $7,366,924.93, (Schedules, p.6, #6), thus coming in just $133,075.07 under the SBRA's aggregate $7.5 million debt limit. TDI included no debts to insiders on its Schedules.

A closer examination of the Schedules shows just how TDI was able to come in under the SBRA's $7.5 million debt limit. The Schedules suggest that TDI owes the Internal Revenue Service ("IRS") $650,000. Schedules, p.14. But soon after the Petition Date, the IRS filed a proof of claim indicating that actually it was owed $979,815.19, a difference of $329,815 more than the scheduled amount. If TDI's Schedules falsely reported *only* the IRS's claim, then that alone would be enough to put TDI's total liabilities at $7,696,740.12, or nearly $200,000 over the SBRA's debt limit.

But there's more. In order to come in under the $7.5 million limit, TDI also had to play some games with the claim of Prometeon, which is TDI's largest creditor. Prometeon is owed more than $10 million for tires that it delivered to TDI, but which TDI never paid for, as shown in the proof of claim that Prometeon filed on March 5, 2021. *See* Claim No. 9. In its Schedules, however, TDI listed its debt to Prometeon as "disputed" and "unliquidated," and only $3 million. Schedules, p.18, §2.3.

At TDI's section 341 meeting of creditors, its CEO, Mr. Veen, would say only that TDI reduced the amount of Prometeon's claim on its Schedules because "TDI basically has offset claims against Prometeon for breach of their promises and because of that we suffered big losses and that's why we claimed those sums as disputed." *See Transcript of 341a, Second*

1    *Session* ("341-II," attached as Exhibit B to the Goldberg Decl., p.17).  TDI's counsel then

2    instructed Mr. Veen to answer no further questions on this topic.  *Ibid.*

3        TDI's newly minted "breach of promises" story, however, is contradicted by a letter

4    written by *TDI's own litigation counsel* just 12 days before the Petition Date.  On January 20,

5    2021, in an effort to resolve a collection suit brought by Prometeon, TDI's litigation counsel

6    acknowledged the validity and amount of the debt it owed to Prometeon when it sent

7    Prometeon a letter in which it proposed a payment plan for TDI to pay this long overdue debt.

8    *See* Goldberg Decl., Exhibit C ("Tires Direct is willing to provide a consent judgment in the

9    amount of $12,028,332.00…").  TDI's own words and documents here make clear that TDI's

10    supposed eligibility for Subchapter V is nothing but a sham.

11        But there's still more.  Magna, another one of the Suppliers, sold TDI over $7 million

12    worth of tires prior to the Petition Date, and filed two separate proofs of claim, one for

13    $6,492,156.55, and a second in the amount of $708,804.45, for a total claim of $7,200,961.

14    *See* Claims No. 5 & 6.  Yet on the Schedules, TDI alleges that it owes *nothing* to Magna, and

15    that this debt, like the debt to Prometeon, suddenly is "unliquidated" and "disputed."

16    Schedules, p.25, §3.20.  At the section 341 meeting, TDI refused to provide any explanation

17    for the $7 million difference, other than to say, "I believe there are setoffs and damages with

18    the conduct of Magna with the amount they claimed from us." 341-II, at 20:17-18.

19        But there's even more.  Aeolus and Qingdao, which are tire suppliers like Prometeon

20    and Magna, are also among TDI's largest creditors.  While Aeolus and Qingdao filed claims

21    for $4,275,037.50 and $464,904.50, respectively, *see* Claims #1 & #2, TDI scheduled Aeolus

22    and Qingdao as being owed only $1,700,000 and $150,000, respectively, with both listed as

23    "disputed."  Schedules, pp.22 and 25, §§3.2 and 3.26.

24        In summary, by manufacturing some vague "disputes" and "offsets" that its CEO could

25    not explain under oath, TDI, in its Schedules, improperly reduced the amount of its actual

26    liabilities owed (compared to the actual amounts as stated in the proofs of claim) for these 5

27    creditors, reducing actual claims of almost $20 million for just these 5 creditors to less than

28

180175804.2

1   $6 million.  In other words, in order to manufacture a basis for proceeding under Subchapter

2   V, TDI made almost $15 million in liabilities vanish.

3       A subsequent pleading filed by TDI effectively acknowledges that the figures

4   presented in TDI's Petition and Schedules with respect to TDI's liabilities are false, and that

5   its actual liabilities far exceed the SBRA's $7.5 million statutory debt cap.  Specifically, in its

6   *Supplement To Debtor's Voluntary Chapter 11 Petition Re: Compliance With The*

7   *Requirements Of 11 U.S.C. §§1116(1) And 1187(a)* ("Supplement") [Dkt. No. 12], TDI

8   submitted its "most recent balance sheet" showing that TDI's non-insider "Accounts Payable

9   General" were $13,447,940.08, far in excess of the SBRA's $7.5 million statutory maximum.

10  Supplement, p.7.  Through the declaration submitted with the Supplement, Mr. Veen testified

11  to the validity of this balance sheet. Supplement, pp.4-5.

12      But of course, there's even more.  As of March 16, 2021, nearly four weeks before the

13  April 12, 2021 bar date set by the Court for filing proofs of claim in this case, the Court's

14  official claims register already showed that 9 claims had been filed, totaling over $23 million,

15  more than 3 times the maximum amount permitted for an SBRA debtor.

16  **B.  TDI Is Not "Engaged in Commercial or Business Activities."**

17      To be eligible to file as a small business debtor under the SBRA, a debtor must be

18  "engaged in commercial or business activities" on the Petition Date.  11 U.S.C. § 1182(1)(A).

19  TDI, however, freely admits that it ceased operations prior to the Petition Date and has not

20  resumed operations.  *See Debtor's Motion to Reject Unexpired Lease of Real Property, etc.,*

21  ("Motion to Reject"), Dkt. No. 18, p.4 ("The Debtor ceased regular business operations in or

22  about December 2020"); *Debtor's Subchapter V Status Conference Report* ("Status Report"),

23  Dkt. No. 33, p.3 (same); *Transcript of 341a, First Session* ("341-I," attached as Exhibit A to

24  the Goldberg Decl., pp.9-11 ("Q: [I]s the is the debtor currently operating?  A: No, it's not.").

25      TDI also admits that while it needs warehouse space to operate its business, it has

26  closed, and terminated the leases for, each of its 4 warehouses, and currently has no

27  warehouse or office of its own (341-I, p.11); has no employees other than its CEO (341-II

28  p.2); has sold no tires, or otherwise generated any revenue, since the Petition Date (341-II,

-8-

1  p.8); and, as of the Petition Date, had only about $6,000 in cash on hand. 341-I, p.12. TDI's

2  first monthly operating report ("February MOR") [Dkt. No. 36], filed on March 15, 2021 for the

3  month of February 2021, confirms that TDI has no sales or revenues, and is losing money

4  on both a cash and accrual basis. *See* February MOR.[1]

5      The President, CEO and Chairman of the Board of TDI is Mr. Sanjeet Singh Veen,

6  who is also the "Authorized Representative" of TDI's debtor affiliate, Texas Tire Warehouse

7  ("TTW, and together with TDI, the "Debtors"). 341-I at 28:7; 341-II at 3:3-4. Mr. Veen

8  appeared as the representative of both Debtors at the 341 meeting, and testified that the

9  reason why the Debtors filed for bankruptcy was that sales declined 70-80% due to a

10  combination of (a) a reduction in demand due to COVID-19, and (b) increases of more than

11  70% in the tariffs and duties they had to pay on tires imported from China, where they sourced

12  the tires they re-sold in the U.S. 341-I, p.5. When asked at the section 341 meeting how the

13  Debtors planned to reorganize, Mr. Veen offered up only unfounded optimism. The plan, he

14  said, was to wait for the Biden Administration to reduce the tariffs and duties (though there

15  was no evidence that such reductions would happen anytime soon, or was even in process),

16  and to wait for the COVID-19 situation to improve. 341-II, pp.5-6.

17  **C. Mr. Veen, TDI's President & CEO, and TTW's Authorized Representative, Is A**
18  **Convicted Felon and Thus Not Qualified to Serve as A Fiduciary for Creditors.**

19      Mr. Veen was convicted of the federal crime of wire fraud in 2012 in the U.S. District

20  Court for the Northern District of Mississippi. *See* de Ruijter Decl., Ex. A. Mr. Veen's wire

21  fraud conviction arose from a fraudulent scheme that Mr. Veen orchestrated where he

22  induced various tire manufacturers to sell tires on credit to entities he controlled, which

23  entities then failed to pay for the tires, *just like he has been doing here with TDI and TTW.*

24

25

---

26  [1]  The February MOR also shows that, following the Petition Date, TDI received $40,000 in cash from the
wife of Mr. Veen, its CEO, as well as from non-debtor affiliates, each of which TDI characterizes as a
27  "capital contribution or gift." February MOR, p.7. The February MOR also shows that all of these funds
were used to make post-petition payments to TDI's bankruptcy counsel ($20,000) and litigation counsel
28  ($20,000), notwithstanding that no professional has filed an application for approval of compensation
in this case.

180175804.2

Case 8:21-bk-10245-SC    Doc 51    Filed 03/25/21    Entered 03/25/21 15:35:58    Desc
Main Document    Page 10 of 21

1    *Ibid.*  Mr. Veen ultimately was sentenced to serve 40 months in federal prison and ordered

2    to pay $6.8 million in restitution.  *Ibid.*

3    Mr. Veen appears to be running the same scam in the Debtors' cases that previously

4    sent him to prison.  In order to induce Magna to sell tires to and extend credit to TDI, Mr.

5    Singh concealed from Magna material facts, including his conviction for wire fraud in the tire

6    business.  de Ruijter Decl., ¶5.  Deprived of this relevant information, Magna began selling

7    the Debtors and their affiliates large quantities of tires used on trucks and earthmoving

8    equipment.  In all, from September 2019 to April 2020 Magna sold and delivered to the

9    Debtors and their affiliates a total of $12,641,609.10 worth of tires.  de Ruijter Decl., ¶6.  The

10   Debtors, however, failed to pay for most of these tires, resulting in Magna filing claims against

11   TDI totaling $7,200,961.00 (Claim Nos. 5-1 and 6-1), and against TTW for $398,460.06.

12   With the Debtors, Mr. Veen is reprising the scam that landed him in jail for wire fraud.

13   Martin Gerst worked as the Regional Manager of wholesale tire sales for TDI, was involved

14   in the operations of TTW in Dallas, Texas for Mr. Veen, and reported directly to Mr. Veen.

15   Mr. Veen was intimately involved in almost all aspects of the Debtors' operations, including

16   the movements of inventory, sales, purchasing, and inventory management.  *See* Affidavit of

17   Martin Gerst, attached as Exhibit E to the de Ruijter Decl. ("Gerst Aff."), ¶5.

18   Mr. Veen's many companies, including TDI and TTW, regularly transferred tire

19   inventory between and among themselves, without any consideration or value and without

20   accounting for these transfers.  Gerst Aff., ¶6-12.  Mr. Veen and his cohorts regularly

21   siphoned off cash directly from their companies for personal use.  Gerst Aff., ¶14-15.  Former

22   TDI employees have testified that Mr. Veen and his companies executed these transfers in

23   order to defraud creditors and conceal assets from creditors.  Gerst Aff., ¶¶ 7,16.

24   Another former employee has testified under oath that Mr. Veen and TDI regularly

25   engaged in various types of irregular, deceptive and unethical conduct, and that TDI's tire

26   inventory was stored, unsegregated by which company owned it, at warehouses across the

27   country.  *See* Affidavit of Marcus Edwardson, attached as Exhibit D to the de Ruijter Decl.

28   ("Edwardson Aff."), ¶¶5-7  This same employee also testified that Mr. Veen and TDI (1) had

-10-

180175804.2

1    no intention of ever paying vendors for the tires they delivered to TDI, and (2) began selling

2    tires sold to TDI by Magna and others at greatly reduced prices, so as to obtain a windfall at

3    the expense of the suppliers.  Edwardson Aff., ¶¶7-13

4        For example, on August 21, 2020, TDI sold approximately 50 Magna tires to the

5    landlord of TDI's Jacksonville warehouse.  Ordinarily, only a few Magna tires are sold at a

6    time, because they are expensive, specialty tires that sell for approximately $1,275 each on

7    retail.  Edwardson Aff., ¶¶15-17.  TDI's cost for the tires, had it remitted payment to Magna,

8    would have been approximately $1,100 each.  Edwardson Aff., ¶16. Notwithstanding, TDI

9    sold the tires to its Jacksonville landlord for $400/tire, or 36% of their retail value. *Ibid.*

10       Mr. Veen also concealed and fabricated sales and purchase information related to the

11   tires.  de Ruijter Decl., ¶16.  TDI then continued these fire sales at a greatly increased pace

12   and shipped tires from facility to facility, without recording sales or shipments—making

13   tracking TDI's inventory nearly impossible.  *Ibid.*  Moreover, Mr. Veen instructed Mr. Gerst to

14   input artificial costs for tires into the financial software that the Debtors were using. Gerst Aff.,

15   ¶¶11-12.  TDI sold most of its inventory at or significantly below cost, Gerst Aff., ¶13, a fact

16   that suggests that Mr. Veen's operation of TDI was no more than a "bust-out" scheme.

17

18

19

20

21

22

23

24

25

26

27

28

180175804.2

**D. TDI Had Almost No Cash on Hand When it Filed Bankruptcy Because Mr. Veen Caused it All to Be Distributed to his Family and Affiliates.**

TDI's Schedules show that when it filed for bankruptcy, it had less than $6,000 in cash on hand.  *See* Schedules, p.8, line 5.  One might think that was the result of TDI having suffered the combined effects of the Trump administration's increased tariffs on Chinese tires and the COVID-19 pandemic, as Mr. Veen suggested at the section 341 meeting, and as the Debtors have stated in their pleadings filed with this Court.  But that is not quite true.

TDI's Statement of Financial Affairs, which is attached to the Schedules, indicates that during 2020, when TDI suffered a monumental sales decline, allegedly due to COVID-19 and tariffs on Chinese goods, TDI somehow found enough cash to transfer $2,381,077.24 to various insiders, including Mr. Veen, his wife, and 8 family-owned tire seller affiliates. Schedules, pp.37-44.  According to Mr. Veen's testimony at the section 341 meeting, these were not payments for goods or services; rather, they were "loans" made on an unsecured basis, with no documentation whatsoever, and Mr. Veen himself admitted that he approved every single transfer.  341-II at 4, 23:15-20.  To put this figure in perspective, TDI's total revenue during 2020 was only $4.8 million. Schedules,  p.31 of 57.  Mr. Veen, however, who is TDI's ostensible "fiduciary," saw fit to "lend" out almost half of its gross revenue to family and affiliates, with no notes, collateral, or documentation, leaving TDI with less than $6,000 of cash to fund its reorganization.

180175804.2

<div align="center">

**III.**

**ARGUMENT**

</div>

**A.  TDI is Not Eligible to Be an SBRA Debtor Because its Liabilities Exceed $7.5**

**Million and it is Not "Engaged in Commercial or Business Activities."**

Bankruptcy Code Section 103(i) authorizes a debtor that qualifies as a small business debtor, as defined in section 1182, to pursue a reorganization under Subchapter V of Chapter 11 of the Bankruptcy Code.  11 U.S.C. § 103(i).  Section 1182(1)(A), in turn, defines a small business debtor as, among other things, a debtor who has noncontingent, liquidated debts of $7,500,000 or less and which is operating its business on the petition date.  11 U.S.C. § 1182(1)(A).  Here, TDI is not eligible to maintain a Subchapter V bankruptcy case because it does not qualify as a small business debtor under section 1182(1)(A) for at least two reasons: (1) TDIs' aggregate noncontingent liquidated debts significantly exceed $7,500,000; and (2) TDI was not operating on the Petition Date.  Therefore, the Court should strike TDI's Subchapter V election and, for the reasons set forth below, convert this case to Chapter 7.

**1.    TDI's Noncontingent Liquidated Debts Exceed $7,500,000**

A debtor may qualify as a small business debtor if it has "aggregate noncontingent liquidated secured and unsecured debts" of not more than $7,500,000 as of the Petition Date.  11 U.S.C. § 1182(1)(A).[2]

Although the term "liquidated" is not defined in the Code, courts adopt the definition of the term as applied in Chapter 13 cases.  *In re Parking Management, Inc.*, 620 B.R. 544, 559 (Bankr. D. Md. 2020).  A debt is "liquidated" if it is "subject to 'ready determination and precision in computation of the amount due.'"  *Foestvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir. 1987), quoting *Sylvester v. Dow Jones and Co., Inc. (In re Sylvester)*, 19 B.R. 671, 679 (9th Cir. BAP 1982).  A debt is "readily determinable" if the amount can be determined by a simple hearing, as opposed to an "extensive and contested evidentiary

---

[2]    TDI does not claim that its debts to the Suppliers are "contingent."  *See, e.g.,* Schedules, pp.18, 22 and 25.  Accordingly, out of respect for the Court and for the sake of brevity, the analysis herein is limited the cogent issue: whether the subject debts are legally "unliquidated."

<div align="center">-13-</div>

1   hearing in which substantial evidence may be necessary to establish amounts or liability." *In*

2   *re Wenberg*, 94 B.R. 631, 634 (9th Cir. BAP 1988).

3         In other words, "[t]he test for 'ready determination' is whether the amount due is fixed

4   or certain or otherwise ascertainable by reference to an agreement or by a simple

5   computation." *In re Nicholes,* 184 B.R. 82, 89 (9th Cir. BAP 1995).  Debts of a contractual

6   nature are generally "liquidated," even if their amount is disputed.  *Slack v. Wilshire Ins. Co.*

7   *(In re Slack),* 187 F.3d 1070, 1074 (9th Cir. 1999) ("Even if a debtor disputes the existence of

8   liability, if the *amount* of the debt is calculable with certainty, then it is liquidated . . .").

9         Here, TDI cannot credibly claim that that the Suppliers' claims are unliquidated, even

10  if the amount is disputed, because their claims are of a contractual nature and can be

11  ascertained "by simple computation."  All the Court has to do to calculate the amount of the

12  Suppliers' claims is to look at their proofs of claim, each of which has attached to it either

13  copies of the actual invoices, or a summary thereof.  These proofs of claim, which by law

14  constitute *prima facie* evidence of the amount and validity of each claim, show that the

15  Suppliers' claims alone, without consideration of the claims of any other creditors, far exceed

16  the $7.5 million aggregate debt cap imposed on SBRA debtors  The Suppliers' claims alone

17  show that TDI has aggregate noncontingent liquidated debts of more than $20 million!

18  Accordingly, TDI's case may not proceed under Subchapter V of Chapter 11.

19       **2.**     **TDI Was Not Engaged in Business on The Petition Date**

20         Bankruptcy Code Section 1182(1)(A) limits the "small business debtor" designation to

21  debtors that were "engaged in commercial or business activities" on the petition date.  11

22  U.S.C. § 1182(1)(A).  A growing consensus of courts interpreting section 1182 has held that

23  a debtor is not "engaged in commercial or business activities" if it is not operating on the

24  petition date. *See, e.g., In re Thurmon*, Case No. 20-41400-CAN11, 2020 WL 7249555, at

25  *5 (Bankr. W.D. Mo. Dec. 8, 2020) (granting objection to debtor's Subchapter V designation

26  and converting case to regular Chapter 11 case when debtor was not operating on the

27  petition date); *In re Johnson*, Case No. 19-42063-ELM, 2021 WL 825156, at *7 (Bankr. N.D.

28  Tex. Mar. 1, 2021) (defunct companies ineligible for Subchapter V).

-14-

1  TDI readily admits that it was not operating on the Petition Date.  *See* Motion to

2  Reject, p.4 ("The Debtor ceased regular business operations in or about December

3  2020 . . ."); Status Report, ¶7 (same); 341-l, pp.9-11 ("Q: [I]s the is the debtor currently

4  operating?  A: No, it's not.").  Accordingly, since TDI was not "engaged in commercial or

5  business activities" on the Petition Date, TDI does not qualify as a small business debtor and

6  is ineligible to have this case proceed as an SBRA case.

7  **B. Mr. Veen Is Not A Proper Fiduciary and Is Not Qualified to Serve as The CEO Or**

8  **Authorized Representative of Any Debtor.**

9  As articulated by the United States Supreme Court, "if a debtor remains in

10 possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the

11 same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out

12 of possession.  Indeed, the willingness of courts to leave debtors in possession 'is premised

13 upon an assurance that the officers and managing employees can be depended on to carry

14 out the fiduciary responsibilities of a trustee.'" *Commodity Futures Trading Com'n v.*

15 *Weintraub*, 471 U.S. 343, 355 (1985), *quoting Wolf v. Weinstein*, 372 U.S. 633, 651 (1963).[3]

16 The enhanced scope of a Chapter 11 debtor-in-possession's fiduciary duties is further

17 emphasized by the requirements of Bankruptcy Code section 1104(a).  *See In re V. Savino*

18 *Oil & Heating Co., Inc.*, 99 B.R. 518, 525-26 (Bankr. E.D.N.Y. 1989) ("the encompassing

19 language of section 1104(a)(1)" reflects that the "willingness of Congress to leave a debtor-

20 in-possession is premised on the expectation that current management can be depended on

21 to carry out the fiduciary responsibilities of a trustee.")

22

23  _____

24  [3]    *See also, In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020), *citing In re Circulatory Ctrs. Of Am., LLC*, 579 B.R. 752, 760 (Bankr. W.D. Pa. 2017) (appointing chapter 11 trustee based on findings that debtor could not discharge its fiduciary duties in light of scheme to engineer involuntary bankruptcy filing); *In re Cloudeeva, Inc.*, Case No. 14-24874, 2014 WL 6461514, at *6 (Bankr. D. N.J. Nov. 18, 2014) (finding that appointment of a trustee was warranted, among other reasons, because "the court has such serious concerns about the fitness of current management"); *In re Houston Regional Sports Network, L.P.,* 505 B.R. 468, 481 (Bankr. S.D. Tex. 2014) (*citing Weintraub* and *Wolf* and noting a "sine qua non in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession . . ., who are responsible for managing the debtor's estate in the best interest of creditors"); *Matter of Nugelt*, 142 B.R. 661, 666 (Bankr. D. Del. 1992) (citing to the fiduciary obligations espoused in Weintraub and Wolf and noting that "[f]ailure to comply with these obligations may be cause for dismissal").

25

26

27

28

1       In *In re Miell*, 419 B.R. 357 (Bankr. N.D. Iowa 2009), the Court converted a Chapter

2 11 case to Chapter 7 (after having previously appointed a Chapter 11 trustee), noting, among

3 other things, the debtor's prepetition conviction in federal court on multiple counts of fraud.

4 In addition, a prepetition fraud conviction, by itself, has been found to constitute cause for

5 appointment of a Chapter 11 trustee under section 1104(a)(1).  *See Gomez v. U.S. Trustee*,

6 Case No. 7:09 CV00496, 2010 WL 582706 (W.D. Va. Feb. 18, 2010) (affirming the

7 bankruptcy court's appointment of a Chapter 11 trustee based solely on the individual

8 debtor's prepetition fraud conviction related to the operation of his medical practice).  The

9 court noted that the plain language of Bankruptcy Code section 1104(a) clearly contemplates

10 consideration of prepetition conduct as cause for appointment of a trustee, and that the

11 criminal offenses of which the debtor was convicted "involved some measure of fraud,

12 deception, and/or dishonesty." *Id.* at *2.

13       The court in *In re Sann*, Case No. 14-61370-11, 2015 WL 1943911 (Bankr. D. Mont.

14 Apr. 29, 2015), found cause to dismiss or convert "based on the evidence in the record of

15 Sann's fraud and dishonesty, as shown by his pleas of guilty to wire fraud and money

16 laundering, and for gross mismanagement of the affairs of the Debtor before and after the

17 commencement of the case." Id. at *12.  The court further held that conversion to Chapter

18 7, rather than dismissal, was in the best interests of creditors since a Chapter 7 trustee would

19 have the ability to investigate the debtor's financial affairs, negotiate with creditors, liquidate

20 assets and prosecute fraudulent transfer claims.  Id. at *13.

21       Here, Mr. Veen, who serves as the President and CEO of TDI, and as the Authorized

22 Representative of TTW, was convicted of wire fraud and served time in prison for that

23 offense.  The crime of wire fraud is defined under federal law as follows:

24         Whoever, having devised or intending to devise any scheme or artifice to
defraud, or for obtaining money or property by means of false or
25         fraudulent pretenses, representations, or promises, transmits or causes
to be transmitted by means of wire, radio, or television communication in
26         interstate or foreign commerce, any writings, signs, signals, pictures, or
sounds for the purpose of executing such scheme or artifice, shall be fined
27         under this title or imprisoned not more than 20 years, or both.

28

180175804.2

18 U.S.C. § 1343.  Wire fraud is a crime of dishonesty, the conviction for which renders Mr. Veen totally unsuitable to serve as a fiduciary for creditors in a Chapter 11 case.  Not only that, but the acts of fraud he was convicted of –defrauding tire suppliers for the benefit of his tire business– have a direct bearing on this case.  TDI, of course, is a tire seller, run by Mr. Veen, which has run up millions of dollars in legitimate debts to the Suppliers, siphoned off money to related companies and Mr. Veen's family, and now can't pay its obligations.

**C.  TDI's Chapter 11 Case Should Be Converted to Chapter 7.**

Bankruptcy Code Section 1112(b) sets forth a non-exclusive list of factors that constitute "cause" to dismiss or convert a Chapter 11 case.  11 U.S.C. § 1112(b).  Section 1112(b)(1) provides that "the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1).  Pursuant to section 1112(b)(4)(A), "cause," which *mandates* conversion or dismissal of a Chapter 11 case, includes "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. 1112(b)(4)(A).  Here, cause exists to convert or dismiss TDI's case because the estate is diminishing in value and there is no likelihood of rehabilitation.

While the Court could simply dismiss TDI's case, that would only force TDI's creditors to continue chasing TDI in multiple jurisdictions across the country, resulting in the proverbial "race to the courthouse."  In contrast, converting the case to Chapter 7 will result in the appointment of a neutral, responsible fiduciary in the form of a trustee to investigate, take control of, and ultimately liquidate TDI's assets for the benefit of all legitimate creditors.

Diminution, the first element of section 1112(b)(4)(A), exists if the value of the estate declines during the case or the debtor has a negative cash flow.  *In re USA Commercial Mortg. Co.*, 452 Fed.Appx. 715, 724 (9th Cir. 2011), citing *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004) ("[A] negative cash flow situation is sufficient to establish continuing loss to or diminution of the estate.")  TDI's estate is indisputably diminishing and

1  TDI has not operated since December 2020, three months before its bankruptcy filing.  *See*

2  Status Report, pp.3 and 6.  Since the Petition Date, TDI has not sold a single tire, and has

3  collected only $5,000 from the collection of accounts receivable, while incurring nearly

4  $37,000 in expenses, not counting bankruptcy professional fees.  *See* TDI's February MOR,

5  p.2; Status Report, p.6.  In other words, TDI's estate is indisputably being diminished.

6       The second element of cause under section 1112(b)(4)(A), "absence of a reasonable

7  likelihood of rehabilitation," does not focus on "the technical [issue] of whether the debtor can

8  confirm a plan, but, rather, whether the debtor's business prospects justify continuance of

9  the reorganization effort."  *In re Hassen Imports Partnership*, Case No. CC-13-1042, 2013

10  WL 4428508 at *14 (9th Cir. BAP Aug. 19, 2013) (internal citations omitted.)  "Rehabilitation

11  is not another word for reorganization.  Rehabilitation means to reestablish a business.

12  Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not

13  include liquidation." 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][ii] (Alan J. Resnick and Henry J.

14  Sommer eds., 16th ed.) (footnotes omitted.)

15       A debtor with negative net income does not have a reasonable likelihood of

16  rehabilitation.  *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009) (debtor does

17  not have a reasonable prospect of rehabilitation when it has a negative net income) (internal

18  citations omitted).  Similarly, rehabilitation is not possible when a debtor has "no operating

19  business, no cash flow, [and] no revenues . . . ."  *In re Sakon,* 617 B.R. 7, 16 (Bankr. D.

20  Conn. 2020) (finding that debtor failed to demonstrate that it could rehabilitate when it did not

21  have "cash flow that can support" current obligations or a reorganization plan).  TDI admits

22  that it has not operated for months prior to the Petition Date and that it has a negative cash

23  flow.  Thus, for either of these reasons, TDI has no reasonable prospect of rehabilitation.

24       Based on the foregoing, more than sufficient cause exists under Bankruptcy Code

25  section 1112(b) to convert TDI's case to Chapter 7.  While the Court has discretion to choose

26  between converting or dismissing this case for "cause," the Suppliers respectfully suggest

27  that the Court should choose conversion because that is clearly in the best interest of

28  creditors.  11 U.S.C. § 1112(b)(1).  While the Bankruptcy Code does not define "best interests

-18-

180175804.2

1    of the creditors," creditors are the "best judge of their own best interests, and if all of the

2    [creditors] agree on one course of action, the court should accommodate their desire."  7

3    *Collier on Bankruptcy* ¶ 1112.04[7] (Alan J. Resnick and Henry J. Sommer eds., 16th ed.)

4    (footnotes omitted).  Here, the Suppliers, who are by far TDI's largest creditors, all request

5    that the Court convert this case rather than dismiss it.

6           Even if the Court is not inclined to defer to the Suppliers' preference for conversion, a

7    review of common section 1112(b) factors also demonstrates that conversion is appropriate

8    here.  In deciding between conversion or dismissal, courts consider the following factors: (1)

9    "whether equality of distribution would be better served by conversion rather than dismissal";

10   (2) "whether conversion or dismissal of the estate would maximize the estate's value as an

11   economic enterprise"; (3) "whether any remaining issues would be better resolved outside

12   the bankruptcy forum"; and (4) "whether any property remains in the estate to be

13   administered." *Id.* (footnotes omitted).

14          All the relevant section 1112(b) factors favor conversion over dismissal here.  <u>First</u>*,*

15   TDI is a defendant in at least five lawsuits filed by the Suppliers and others.  *See* <u>Status</u>

16   <u>Report</u>, p.7.  If this case is dismissed, those lawsuits would leave creditors in a race to the

17   courthouse that would inequitably reward those creditors that have the resources to quickly

18   engage in such litigation, to the detriment of other, smaller creditors.  In contrast, converting

19   the case to Chapter 7 will ensure the equality of any distribution ultimately made to creditors.

20          <u>Second</u>, converting, rather than dismissing, the case will maximize the value of TDI's

21   estate by avoiding the need for TDI to spend its scarce cash to defend multiple state court

22   lawsuits, and making sure that Mr. Veen can no longer exercise his pernicious (and felonious)

23   influence over TDI.  Installing an independent trustee will also give creditors the comfort and

24   peace of mind of having a true fiduciary to investigate the more than $2.3 million that TDI

25   transferred to insiders in the year before the Petition Date, as well as any other potentially

26   avoidable transactions that may be found.  The existence of these transfers, made to insiders

27   with a presumed close relationship to Mr. Veen, further demonstrates why TDI, with Mr. Veen

28

-19-

180175804.2

1   at the helm, cannot act as an independent fiduciary, because creditors cannot trust that Mr.

2   Veen will diligently pursue avoidance of such transfers for the benefit of the estate.

3        <u>Third</u>, there are <u>no</u> issues present here that would be "better resolved outside the

4   bankruptcy forum."   Indeed, this Court is the best forum in which to address the issues

5   present here, such as avoiding and recovering the substantial prepetition transfers that Mr.

6   Veen directed to be made to insiders and affiliates, investigating other potential causes of

7   action related to Mr. Veen and other insiders of the Debtors, and investigating whether the

8   Debtors' estates should be substantively consolidated with each other, and/or with the assets

9   and liabilities of non-debtor insiders and affiliates.

10        <u>Fourth</u>, regarding the issue of "whether any property remains in the estate to be

11   administered," the answer is clearly "Yes," which militates toward conversion rather than

12   dismissal.   While the current liquid assets remaining after Mr. Veen's schemes may be

13   relatively small in value, such assets, together with potential recoveries from avoidance

14   actions and other causes of action that may be pursued by a trustee are certainly greater

15   than what would be available to creditors if the case were dismissed and all creditors are left

16   to fend for themselves.

-20-

180175804.2

1

## IV.

## CONCLUSION

For all the forgoing reasons, the Suppliers respectfully request that the Court de-

designate TDI's case as a Subchapter V case, and convert TDI's Chapter 11 case to one

under Chapter 7 of the Bankruptcy Code.

Dated: March 25, 2021                        DLA PIPER LLP (US)

*/s/ Eric D. Goldberg*
Eric D. Goldberg
Attorneys for Prometeon Tyre Group
Commercial Solutions, LLC


WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP

*/s/ Mark G. Ledwin*
Mark G. Ledwin
(Admitted *Pro Hac Vice*)
Attorneys for Magna Tyre Group

180175804.2